CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/26/2018
JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

GERALD ERNEST CRAIG,

*Plaintiff,*

v.

BEDFORD COUNTY, *ET AL.*,

*Defendants.*

CASE NO. 6:17-CV-00028

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This case grew out of an electoral dispute in Bedford County that culminated in Plaintiff Gerald Craig's firing.  Craig had voted as part of the Bedford County Republican Party to censure Defendants Curry Martin, Bill Thomasson, and Steve Wilkerson, who are each members of Defendant Bedford County's Board of Supervisors, for raising taxes.  Craig was later hired by Bedford to be its Director of Tourism.  However, after a political sea-change, Martin, Thomasson, and Wilkerson gained control of the Board of Supervisors.  They appointed Defendant Carl Boggess as County Administrator.  Boggess then fired Craig.  Boggess claims Craig was not doing a good job; Craig and many of the other members of the Board of Supervisors say Craig was treated differently than other employees and fired because of his censure vote.  The Defendants have moved for summary judgment.[1]  While Defendants are entitled to summary judgment on three of Plaintiff's ancillary theories, genuine disputes of material facts prevent summary judgment on the central First Amendment retaliation theories.

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the

---

[1]    Plaintiff Craig withdrew his cross-motion for summary judgment.  (Dkt. 26).

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute about a material fact must be "genuine." *Id.* A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* But in order to for a jury to rely on the evidence, and therefore for the evidence to preclude summary judgment, the evidence of the disputed fact must be admissible. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016). As the Defendants moved for summary judgment, the following facts are recounted in "the light most favorable" to Craig. *Id.*

## II.   FACTS

### A.   The Censure Vote

At a Bedford County Republican Party meeting in October 2014, Craig voted to censure three of the seven members of Bedford's Board of Supervisors (Defendants Curry Martin, Bill Thomasson, and Steve Wilkerson) for voting to raise real estate taxes. (Dkt. 27-4 at 1).

### B.   Craig's Hiring

Around that same time, Bedford also created a hiring committee to find a new Director of Tourism. (Dkt. 27-3 at 7, 12). This committee interviewed six individuals before deciding Craig was "the strongest candidate." (*Id.* at 7; dkt. 20-1 at ECF 6). The then-serving County Administrator planned to offer him the job. (Dkt. 20-1 at ECF 7).

The individual Defendants were unhappy with this decision because of Craig's recent censure vote. Bill Thomasson was incensed by the censure vote and accompanying newspaper coverage, and expressed his disapproval of the decision to hire Craig to members of the hiring committee. (Dkt. 27-3 at 14). Curry Martin was likewise "really mad." (*Id.*). He responded to the news with profanity and said "he didn't think [Bedford] should hire someone that had gone

against a supervisor, had voted against a supervisor." (*Id.* at 15). Wilkerson cursed at another board member, was angry about the censure vote, and likewise said "we should not hire anybody that had gone against a supervisor." (*Id.*). Boggess relayed these sentiments to the then-serving County Administrator, Mark Reeter. (Dkt. 27-4 at 1; dkt. 27-9 at ECF 6).

Despite these statements, Reeter orally offered the job to Craig. (Dkt. 20-1 at ECF 13). On December 4, 2014, Reeter also gave Craig an offer letter that laid out one set of specific goals for his first six months and then a separate set of goals for the second six months. (*Id.* at ECF 8).

## C.    Bedford's Hiring Policies and Probationary Periods

In normal circumstances, Bedford's policies dictated that new employees were "probationary" for the first six months after they were hired. (Dkt. 27-1 at 13). At the end of the probationary period, lower level employees would then become "regular" employees who were entitled to grievance hearings. (Dkt. 27-1 at 13). But directors remain at-will employees, even after they became "regular" employees. (*See* dkt. 20-1 at ECF 7; dkt. 27-10 at 110). So for a director like Craig, the primary significance of the end of the probationary period was a likely pay increase. (Dkt. 20-4 at 2 (offer letter); *see* dkt. 20-1 at ECF 11 ("[A]djustment of compensation will be in large measure determined by relative progress toward or completion of goals and activities.")). Bedford's policies additionally state that, if an employee's performance has not been satisfactory, the probationary period may be extended up to three more months to give more time for evaluation. (Dkt. 27-1 at 14).

Craig's offer letter did not speak in terms of a "probationary" period, but it did lay out the specific goals for his first year mentioned above. (Dkt. 20-4). At least one of the members of the Board of Supervisors, John Sharp, testified in his deposition that this twelve month evaluation period placed in Craig's offer letter was only placed there because of Craig's censure

vote. (Dkt. 27-7 at 35). Sharp believed this extended probationary period was necessary to "appease" those members of the Board of Supervisors who had opposed Craig's appointment and complained to Reeter. (*Id.* at 36). It was highly unusual to have a probationary period longer than six months. (Dkt. 27-4 at 1; dkt. 27-8; dkt. 27-11).

### D. Craig's Work

Craig began work on December 1, 2014. (Dkt. 27-15). Multiple members of the Board of Supervisors stated that Craig was doing a good job. (*See* dkt. 27-4 at 1 ("As a Supervisor and as a citizen of Bedford County, I was consistently pleased with the work performance of Mr. Craig as Director of Tourism during his tenure. I know of no justifiable reason for his termination."); dkt. 27-8 (same); dkt. 27-11 at 2 (same); dkt. 27-4 at 1 ("During my tenure on the Board, I found Mr. Craig to be very active in his role as Director of Tourism. I personally observed him to successfully work on numerous Tourism projects.")). The Chairwoman of the Board, who was also a member of the Personnel Committee, was not aware of any issues with Craig's performance. (Dkt. 27-11 at 2 ("As Chairwoman and a member of the Personnel Committee, I should have been informed of the decisions related to Mr. Craig's employment, but no discussions were held.")). Reeter, the County Administrator who hired Craig, thought Craig was "making progress," "out there . . . trying to talk with the stakeholders," and "developing an operational knowledge . . . of the Welcome Center . . . ." (Dkt. 20-1 at 16).

### E. A Political Change and Boggess's Reign

For reasons unrelated to this case, Reeter stepped down as County Administrator in April or May 2015. (Dkt. 20-6 at ECF 4). Carl Boggess, who had been the County Attorney, was made the interim County Administrator. (*Id.* at ECF 2). The Board of Supervisors harbored concerns about making Boggess the permanent County Administrator. (Dkt. 27-5 at 60 ("We

had decided that we did not want to make Mr. Boggess the County Administrator."). Accordingly, the decision of who would become the permanent County Administrator lingered through the fall elections.

While all the members of the Board of Supervisors ran as Republicans (*see* dkt. 27-10 at 75 ("In Bedford County you must.")), the Board of Supervisors was split between two different factions: those who were fiscally conservative and those that were less so. (*Id.*). Craig had been hired when a fiscally conservative group was the in the majority, but an election in the fall of 2015 upended that balance of power. (*Id.* at 76). Now, a group that supported Boggess—including Defendants Martin, Thomasson, and Wilkerson—took charge. (*Id.*).

In December 2015, Boggess announced he would be the permanent County Administrator at the Smith Mountain Lake Chamber of Commerce meeting, even though the previous board had said they would advertise the position and interview applicants. (Dkt. 27-15).[2] And then at the first board meeting of the newly formed majority, in January 2016, Boggess was made the permanent County Administrator. (Dkt. 20-6 at ECF 9).

F.     **The November 2015 Letter**

Bedford received a letter written by "Bedford County Tourism Stakeholders" that criticized Craig's work as tourism director. (Dkt. 20-14 at ECF 4). This letter, signed by representatives from the National D-Day Memorial, the Peaks of Otter Winery, and others, lays out specific criticisms of Craig including: his lack of qualifications, the closing of a citizen's advisory tourism group, the amount spent on marketing, and Craig's failure to attend various tourism industry shows. (Dkt. 20-18).

---

[2]     Boggess disputes that he made these statements, (dkt. 20-6 at ECF 9), but the Court credits Craig's account at this stage.

Significant clouds surround this letter. The letter itself was dated November 15, 2015 (dkt. 20-18), but it may not have been delivered to Bedford until mid-to-late December. (Dkt. 20-17 at ECF 4; dkt. 27-10 at 74). The letter was not processed like other mail. It was delivered by a "political operative" who supported the censured Defendants. (Dkt. 27-11 at 1). Unlike other correspondence addressed to the Board, it was not date stamped upon receipt, a fact that was a "red flag" to the then-sitting Chairwoman of the Board of Supervisors. (*Id.*). Under Bedford's normal operating procedures, letters like this would immediately be given to the Chairwoman. (*Id.*). But the sitting Chairwoman was never alerted to the letter. (*Id.*). The letter was never given to the sitting Board of Supervisors (which supported Craig), but was saved until the new Board (which was critical of Craig) had taken over. (Dkt. 20-14 at ECF 4). That Board evaluated the letter in early January. (*Id.*).

**G.      Feedback and the Firing**

In the first few months of his employment, Craig did not receive feedback from County Administrator Reeter, who hired him. (Dkt. 20-1 at ECF 16). Six months into Craig's tenure, in July 2015, Craig asked Boggess (who was then working as interim County Administrator) for a review in accordance with his offer letter. (Dkt. 27-10 at 54). Boggess had only been on the job for two months and said he was not yet in a position to review Craig's performance. (*Id.*). Craig did not receive any feedback at this point.

Craig and Boggess met again on November 24, 2015. (Dkt. 27-10 at 59). This was at the end of the twelve month period described in the December 2014 offer letter. Boggess again did not give any feedback, and instead told Craig that his probationary period was being extended another six months. (*Id.* at 62). Boggess conceded that this extension was "not in accordance with [Bedford County's] policy," which only allowed a three month extension of the initial six

6

month probationary period. (Dkt. 27-9 at 9). Multiple Board members stated they were not aware of this sort of an extension ever occurring before or after. (Dkt. 27-4 at 1 ("I know of no other employee of Bedford County who has had a probationary period that lasted anything longer than six months. From my perspective, the long probationary period seemed highly unusual if not retaliatory."); dkt. 27-8 (similar); dkt. 27-11(similar)).

At both of these meetings, Craig had prepared documents laying out his accomplishments, but Boggess refused to accept them or provide other feedback on them. (Dkt. 27-10 at 64–65). Throughout this entire period, none of the policies for providing feedback that are listed in Bedford County's Personnel Policy Manual were followed. (Dkt. 27-1). Boggess never gave Craig a written evaluation. (Dkt. 27-9 at 10). Boggess never discussed the November 2015 letter with Craig. (Dkt. 27-10 at 72).

Two days before his final meeting with Craig in April 2016, Boggess told members of the Board of Supervisors that he was going to fire Craig. (Dkt. 27-4 at 2; dkt. 27-10 at 64–65). One member testified that "Boggess stated that when he met with Mr. Craig the first time, he already had his mind made up to terminate him and that he just had to figure out how he was going to do it." (Dkt. 27-4 at 2; dkt. 27-7 at 45 ("He said, 'No, I didn't have any improvements for him because I was going to terminate him. I just had to figure out how I was going to do it.'")).[3] At the meeting, Boggess walked in and gave Craig a blank notebook and then a laptop with a blank document. (Dkt. 27-10 at 69–70). Boggess said "I want all of the strategies for tourism and I want you to write them and I want them now." (*Id.* at 70). Craig had not been prepared for this or told to bring any notes. (*Id.*). Boggess then left the room. (*Id.*). Craig had gotten through

---

[3]    Boggess denies he said this (dkt. 27-9 at ECF 20), but again the Court must credit the Board member's account at this stage.

about seven strategies before Boggess returned and said, "All right, time is up." (*Id.* at 71). Boggess took the laptop. (*Id.*).

Then, on May 11, 2016, Boggess gave Craig a termination letter stating the priorities, goals, and objectives set out in the original offer letter had not been met. (Dkt. 20-19). Craig and multiple Board members believe that these reasons were pretextual, and Craig was actually fired because of his original vote to censure multiple Board members. (Dkt. 27-4; dkt. 27-8; dkt. 27-11; dkt. 27-15).

### III. HEARSAY

As a threshold matter, evidence must be admissible in order for it to preclude summary judgment. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Hearsay is inadmissible. Fed. R. Evid. 802. Plaintiff seeks to rely on portions of depositions and affidavits that contain hearsay. In particular, various Board members recounted statements made to them by Craig and third parties. (*See, e.g.,* dkt. 27-8 ("Mr. Craig informed me that Carl Boggess had announced at the Smith Mountain Lake Chamber's year-end meeting that Mr. Boggess was going to be hired as the next County Administrator . . . ."). Defendants object to the Court's consideration of these statements. (Dkt. 20 at 15). The objected-to-statements all concerned Boggess's alleged announcement in December 2015 that he would be the next County Administrator. (*Id.*). Because they are hearsay, the Court will not consider these statements. However, the Court does note that the significance of this exclusion is minimal. This is because Craig also testified to Boggess's alleged December 2015 announcement that he would be the next County Administrator. (Dkt. 27-15). Unlike the statements cited above, Craig's statements are admissible because they were made by a party-opponent. Fed. R. Evid. 801(d)(2). So while Defendants prevail on this point, the Court can still consider Boggess's alleged 2015 statements.

# IV. ANALYSIS

The case generally centers on Craig's belief that he was fired for voting to censure Defendants Martin, Thomasson, and Wilkerson. This central theory generates five counts. The Court concludes the first two (which allege First Amendment violations) survive, while the latter three (which allege due process violations) do not.

## A. Counts I and II: Retaliatory discharge in violation of the First Amendment rights to freedom of expression and freedom of association.

To prove a retaliatory discharge in violation of an individual's right to freedom of expression, Craig must prove:

> (1) that he was speaking as a citizen upon a matter of public concern rather than as an employee about a matter of personal interest; (2) that the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) that the employee's speech was a substantial factor in the employee's termination decision.

*Bland v. Roberts*, 730 F.3d 368, 374 (4th Cir. 2013) (quotation marks omitted). "The first two prongs present questions of law to be resolved by the court, and the third prong is a question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'" *Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016) (quoting *Love–Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004)). Here, the parties only dispute the third element.

The claim for retaliatory discharge in violation of Craig's right to freedom of association presents a distinct, but related, theory. "[T]he First Amendment generally bars the firing of public employees solely for the reason that they were not affiliated with a particular political party or candidate." *Bland*, 730 F.3d at 374 (citation and quotation marks omitted). "While [political] beliefs and affiliation are protected by the First Amendment, dismissal may be justified if political party affiliation can be demonstrated to be an appropriate requirement for the

effective performance of the public office involved." *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998) (quotation marks and citations omitted); *see Branti v. Finkel*, 445 U.S. 507, 518 (1980) ("[T]he question is whether the hiring authority can demonstrate that party affiliation [or political allegiance] is an appropriate requirement for the effective performance of the public office involved."). Here, however, Defendants do not argue Craig's termination was justified because political party affiliation was an appropriate requirement for the effective performance of his office. Instead, they deny that Craig's termination was causally related to his political association. So, as with the speech claim, Defendants are only disputing causation.

Craig's public censure vote is the basis of both First Amendment claims; the censure vote was both a form of expression and a form of association. *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979) (recognizing voting as a "form of political expression"); *Kusper v. Pontikes*, 414 U.S. 51, 58–61 (1973) (holding regulation on voting infringed First Amendment associational freedom). The question is what, if any, relation that First Amendment activity had to his termination. And so, while there are differences between the two First Amendment claims, those differences are not implicated here because the "causation analysis for the association claims is the same as for the speech claims." *Bland*, 730 F.3d at 375. Accordingly, the causation element of both the speech and association claims rise and fall together. For both counts, "[t]he plaintiff bears the initial burden of proving that his exercise of his First Amendment rights was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." *Id*. (quotation marks and citations omitted). "[I]f the plaintiff satisfies that burden, the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Id.*

*1. Claim against Boggess.*

Taking the evidence in the light most favorable to Craig, a reasonable jury could find that Craig's exercise of his First Amendment rights was a "substantial" factor in the employer's decision to terminate him. *Bland*, 730 F.3d at 375. Starting at Craig's hiring, Boggess told then-serving County Administrator Reeter about Craig's censure vote. (Dkt. 27-9 at ECF 6). These statements demonstrate Boggess's awareness of Craig's political activity and, taken in the light most favorable to Craig, demonstrate that Boggess thought this political activity was relevant to Craig's employment. (*Id.* ("I said something to the effect of, [Mr. Reeter], I believe that, from what I've heard, there was a vote of censorship and Mr. Craig was involved in that, and since it's political, I thought you should know about that, and that is the only comment I think I made.")).

Then once Boggess was acting as interim County Administrator and Craig had already had a year-long probationary period, Boggess extended Craig's probationary period for six more months. Boggess conceded this extension was "not in accordance with [Bedford County's] policy." (Dkt. 27-9 at 9; dkt. 27-10 at 59). Multiple Board members stated they were not aware of this sort of an extension occurring in any other instances. (Dkt. 27-4 at 1 ("I know of no other employee of Bedford County who has had a probationary period that lasted anything longer than six months."); dkt. 27-8 (same); dkt. 27-11 (same)). A jury could reasonably rely on this disparate treatment, alongside the other evidence, to find Craig's political activity was a substantial factor in Boggess's punitive treatment of Craig.

Likewise, Boggess did not provide written feedback or engage in various other evaluative and remedial measures spelled out by Bedford County's policies (including progressive discipline). (Dkt. 27-1; dkt. 27-9 at 10; dkt. 27-10 at 62). Boggess never discussed the November 2015 letter with Craig. (Dkt. 27-10 at 72). This failure to provide meaningful

feedback must be read alongside Boggess's statement to at least one member of the Board of Supervisors that "that when [Boggess] met with Mr. Craig the first time, he already had his mind made up to terminate him and that he just had to figure out how he was going to do it." (Dkt. 27-4 at 2). And again, when asked by the same Board member whether he had provided feedback to Craig, Boggess said "'No, I didn't have any improvements for him because I was going to terminate him. I just had to figure out how I was going to do it.'" (Dkt. 27-7 at 45). Boggess's denials that he made these statements are immaterial at this juncture, where the Court must take these disputes in the light most favorable to Craig. Finally, the abrupt nature of Craig's final meeting and termination, at least as recounted by Craig (*see* dkt. 27-10 at 69–71; dkt. 20-19), provides further evidence that a reasonable jury could rely upon to find Craig's political activity was a substantial factor in his firing. Such a reasonable jury could accordingly find Craig satisfies his *prima facie* case.

Still, "the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Bland*, 730 F.3d at 375. Although others disagreed, Boggess stated he thought Craig had not met his performance goals. (Dkt. 20-6 at ECF 6; dkt. 20-19). Likewise, the November 2015 letter laid out concerns about Craig's performance. (Dkt. 20-18). But different implications can be drawn, especially in light of the unusual circumstances surrounding the letter and contradictory statements about Craig's performance, and so reasonable jurors could disagree on whether Boggess really fired Craig because of his performance or instead because of his political activity. In the end, these questions demonstrate exactly why the Fourth Circuit "has repeatedly stated that where causal facts are in dispute, giving rise to a genuine issue of material fact, summary judgment is not appropriate." *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d

646, 654–55 (4th Cir. 2017) (evaluating the causation prong in a First Amendment retaliation case).

Boggess's further arguments to the contrary do not change this. His primary argument is that Craig's hiring, subsequent to the censure vote, immunized the eventual decision to fire Craig. He relies on *Lauck v. Campbell Cty.*, 627 F.3d 805 (10th Cir. 2010), where an officer received a positive performance review in between his protected speech and the detrimental employment decision. *Id.* at 814–16. The court found insufficient evidence of causation, at least partially because "[t]he positive performance appraisal is inconsistent with a retaliatory motive." *Id.* at 816. The context here, however, is entirely different. The decision to hire Craig was made by Reeter, in spite of Boggess's opposition. (Dkt. 27-4 at 1; dkt. 27-9 at ECF 6). *Reeter*'s decision is not at all inconsistent with a finding that *Boggess* possessed a retaliatory motive. Instead, crediting Board member Sharp's testimony, Boggess wanted to fire Craig all along and "just had to figure out how [he] was going to do it." (Dkt. 27-7 at 45; dkt. 27-4 at 2). That opportunity presented itself when Boggess was promoted, and Boggess took his opportunity through the irregular extension of Craig's probationary period and eventual termination. So, unlike *Lauck*, there is strong evidence of Boggess's retaliatory motive and no reason to doubt that Reeter's hiring of Craig undermines that evidence.

More generally, Boggess criticizes certain evidence as conclusory and conspiratorial. In particular, Boggess disagrees with Craig's general theory that Defendants Thomasson, Martin, and Wilkerson permanently hired Boggess in exchange for his firing of Craig. In addition to the various evidence described above, Craig points to Boggess's failure to provide him with a review in July 2015 (dkt. 27-10 at 54), the alleged withholding of the November 2015 letter (dkt. 20-18), and the premature announcement that he would be the permanent County Administrator in

December 2015 (dkt. 27-15). There is admittedly scant evidence connecting these events to an overarching conspiracy. But, even holding this testimony to the side, the Court still finds the other evidence summarized above is sufficient for a reasonable jury to find Craig was fired because of his political activity.

Boggess's motion for summary judgment will be denied as to Counts One and Two.

*2. Claims against Thomasson, Martin, and Wilkerson.*

Defendants Thomasson, Martin, and Wilkerson "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (addressing *Bivens* liability). Instead, a plaintiff must prove each "official's own individual actions . . . violated the Constitution." *Id.*; *Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014) ("[L]iability may be imposed based only on an official's own conduct[.]"). So the question here is whether these three Defendants individually participated in terminating Craig because of his political activity.[4]

---

[4]     Craig responds by citing Va. Code § 15.2-1502(D). This provision states:

> an officer of a locality may delegate, to a person reporting to him, his powers and duties unless it is some power or duty the exercise of which by another person is expressly forbidden by law or requires the exercise of judgment for the public welfare. However, such delegation shall not act to relieve the officer making such delegation of his legal obligations for the exercise of powers and performance of duties of his office.

He appears to be arguing that the Board members' delegation to the County Administrator cannot excuse them from Section 1983 liability. But this Virginia statute cannot change the limits of federal Section 1983 supervisory liability. *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996) ("Neither the supervisors in their individual capacities nor the County could be held liable except by proof of their direct culpability in causing the injury to be inflicted by subordinate employees.") (reviewing similar theories of liability for a Virginia county's Board of Supervisors), *overruled on other grounds by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). Craig cites no cases where courts have found otherwise. These three Defendants cannot be held liable for their subordinate's actions.

Craig can again make out his *prima facie* case. While there is not direct evidence connecting these three Defendants to Boggess's May 2016 termination of Craig, a jury could still reasonably rely on circumstantial evidence to find these three Defendants individually participated in his termination. These three Defendants were the subjects of Craig's censure vote. (Dkt. 27-4 at 1). All three then expressed anger at Craig's hiring, and two stated Bedford should not hire employees like Craig who voted against Board members. (Dkt. 27-3 at 14–15; dkt. 27-9 at 6; dkt. 27-11 at 2). These sentiments were communicated to Boggess, who served at the pleasure of the board and eventually fired Craig. (Dkt. 27-4 at 1; dkt. 27-9 at ECF 6).

In order "to appease" these Board members' anger, then-serving County Administrator Reeter gave Craig a longer than normal probationary period. (*See* dkt. 27-7 at 36 ("He said it was specifically, he was trying to appease all seven members of his board. In order to appease all seven members of his board, he was trying to walk a tightrope. The tightrope that he was trying to walk, he determined the way he could walk that tightrope was to give Mr. Craig a 12-month probationary period."). Even after the hiring, various witnesses testified these three Defendants still maintained "hard feelings," (dkt. 27-3 at 26); "a grudge," (dkt. 27-5 at 40); and an inability "to let [the vote] go." (Dkt. 27-7 at 19). These sentiments were expressed both towards Craig and others who had not supported the Defendants during the censure vote. Other Board members thought Craig was targeted throughout his employment by these Defendants because of his censure vote. (Dkt. 27-4 at 1 ("I believe that during the course of his employment, Mr. Craig was targeted by the individuals who were censured due to political beliefs Mr. Craig held and publicized."); dkt. 27-8; dkt. 27-11).

Within this context, these three Defendants were part of the Board that hired Boggess as County Administrator. (Dkt. 20-6 at ECF 9). And, as County Administrator, the Board of

15

Supervisors could hold Boggess responsible if he did not do what they wanted. (Dkt. 27-7 at 25). In light of their history of statements to Boggess about Craig and subsequent frustration with Craig, a reasonable jury could find that these three Defendants were individually involved in the determination to fire Craig because of the exercise of his First Amendment rights.[5]

Of course, these Defendants can avoid liability "if [they] can demonstrate, by a preponderance of the evidence, that [they] would have made the same employment decision absent the protected expression." *Bland*, 730 F.3d at 375. The Defendants contend their opposition to Craig's employment grew out of their belief he lacked experience. (Dkt. 28 at 4). But their contemporaneous statements that Bedford "should not hire anybody that had gone against a supervisor" lead to a genuine factual dispute. (Dkt. 27-3 at 15). Likewise, Boggess's statement that "he already had his mind made up to terminate him and that he just had to figure out how he was going to do it" undermines these three Defendants' argument that the termination was independent of Craig's censure vote. (Dkt. 27-4 at 2).

A reasonable jury could find for Craig, and so these three Defendants' motion for summary judgment will be denied as to Counts One and Two.

### 3. Claims against Bedford County.

Defendant Bedford County argues there can be no municipal liability because there is insufficient evidence that a County policy was the moving force behind Craig's alleged constitutional deprivations. But "municipal liability may be imposed for a single decision by

---

[5]     Craig and others engaged in further speculation about these Defendants involvement. (*See, e.g.*, dkt. 20-13 at ECF 36 ("Q: Do you have any reason to believe that Mr. Boggess did not make the decision to terminate your employment by himself as the county administrator? A: I have no proof of that."). A reasonable jury could not rely on any of that testimony. Likewise, various witnesses engage in speculation about the November 2015 letter and Boggess's statements in December 2015 that he would be the new County Administrator. A reasonable jury likewise could not rely on these statements. But the circumstantial evidence discussed above is sufficient for a jury to find they individually participated in the constitutional violation.

municipal policy-makers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). "To hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 653 (4th Cir. 2017) (quoting *Pembaur*, 475 U.S. at 481). Whether a particular official has final policy-making authority is a question of state law. *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991).

So the central question here is whether Boggess was a municipal policymaker with "final authority to establish municipal policy with respect to the action ordered" under Virginia law. *Pembaur*, 475 U.S. at 481. Under Virginia law, the Board of Supervisors started with final authority over employment policy. Va. Code § 15.2-1500(A). However, under Va. Code § 15.2-1502(D), the Board delegated "to the County Administrator authority in selection, hiring, and dismissal of all other County employees with the exception of the County Attorney." (Bedford County, *Personnel Policy Manual*, Section 1-4 (Rev. July 13, 2009), *available at* http://www.bedfordcountyva.gov/Home/ShowDocument?id=7 (last accessed June 14, 2018)).[6] This delegation gave the County Administrator "final authority" over employment policy.[7]

---

[6]     The Court may "properly take judicial notice of matters of public record" like the Personnel Policy Manual. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[7]     The policy manual does continue by saying: "While actual selection and appointment responsibility is assigned to the County Administrator, the County Board of Supervisors, under Virginia Statutes, retains ultimate authority for all personnel under its auspices." (Bedford County, *Personnel Policy Manual*, Section 1-4 (Rev. July 13, 2009)). But despite this general retention of "ultimate authority for all personnel," it was the County Administrator who made final decisions about employees and policy. (*See* dkt. 20-1 at ECF 2 (describing the role of the County Administrator as "the chief administrative officer of the county government" who was responsible for "the hiring and oversight, discipline and, if necessary, termination or separation of employees"); *id.* at ECF 15 (describing how Board members expressed concerns about hiring decisions, but reiterated "it's [the County Administrator's] decision to make")). He was accordingly a final policy-maker. *See also Pembaur*, 475 U.S. at 483 ("[M]unicipalities often spread policymaking authority among various officers and official bodies.").

Accordingly, Bedford can be held liable for Boggess's determination to terminate Craig. *See Pembaur*, 475 U.S. at 481 ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."). Bedford's motion for summary judgment will be denied as to Counts One and Two.[8]

**B.     Count III: Deprivation of a property interest in violation of procedural due process.**

In order for Craig to make out his procedural due process claim under the property prong, he is required to demonstrate that he possessed a property interest in his employment. *See, e.g., Rockville Cars, LLC v. City of Rockville, Maryland*, 891 F.3d 141 (4th Cir. 2018) ("To establish its procedural due process claim, Rockville Cars must show: (1) that it had a protected property interest; (2) of which the City deprived it; (3) without due process of law."). Virginia is an at-will employment state, and so government employees typically have no property interest in their continued employment. *See Cty. of Giles v. Wines*, 262 Va. 68, 72 (2001) ("In Virginia, an employment relationship is presumed to be at-will, which means that the employment term extends for an indefinite period and may be terminated by the employer or employee for any reason upon reasonable notice."). Craig conceded that employees that hold positions at the Director level, like his position as Director of Tourism, are at-will employees and do not have access to grievance procedures. (Dkt. 27-10 at 110). In his opposition to the Defendants'

---

[8]     Defendants alternatively argue Bedford can be held liable for the actions of Defendants Thomasson, Martin, and Wilkerson. Because the Court finds Boggess was a final policy-maker, the Court does not reach this alternative position.

motion for summary judgment, Craig has not argued he had a property interest in his position.[9]

Because Craig had no property interest, this claim fails. *Wines*, 262 Va. at 75 ("Wines failed to establish that he was an employee terminable solely for cause. Therefore, he has no property right which is protected by the federal constitution and, hence, his claims under 42 U.S.C. § 1983 are not legally cognizable.").

## C.    Count IV: Deprivation of a liberty interest in violation of procedural due process.

Craig also claims that statements made in connection with his termination violated his procedural due process interest in liberty. "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007). "The type of communication that gives rise to a protected liberty interest implies the existence of serious character defects such as dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006). The Fourth Circuit has "distinguished statements that imply such serious character defects from statements that simply allege 'incompetence.'" *Id.* Allegations of "incompetence," "management problems," and "unsatisfactory job performance" do not implicate a protected liberty interest.

---

[9]    There are narrow exceptions to Virginia's presumption in favor of at-will employment, including an exception for "employees who claim to have been discharged in violation of an established public policy." *Bowman v. State Bank of Keysville*, 229 Va. 534, 539–40 (1985). But Craig has not raised this, or any other, argument in favor of his possession of a property interest in his employment. It "is not this court's responsibility to . . . construct the parties' arguments," *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000), or "a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). "District judges are not mind readers," the Fourth Circuit has said, and are not required "to anticipate all arguments that clever counsel may present in some appellate future." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). To demand otherwise would "transform" a court "to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Id.*

*See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006); *Zepp v. Rehrmann*, 79 F.3d 381, 388 (4th Cir. 1996).

The alleged statements here did not imply Craig had character or moral defects. The statements included in Craig's termination letter discuss allegations of poor work performance and a lack of experience. (*See, e.g.,* dkt. 20-19 at 1 ("Despite the fact that you have been an employee of the County for 16 months, there is significant evidence that you do not comprehend the most basic elements of operations."); *id.* at 2 ("[I]t is my opinion that you have failed as to achieve this goal [of identifying and contacting county tourism stakeholder groups]."); *id.* at 2–3 ("I am led to the conclusion that you do not have the capacity to develop a vision nor a strategic plan for County tourism."); *id.* at 3 ("I can come to no other conclusion that your lack of experience in the tourism industry, and more importantly, your total lack of results over the last sixteen months is an insurmountable obstacle.")). Because these statements do not imply character flaws, no reasonable jury could find for Craig on this count and so the Defendants are entitled to summary judgment.

**D.      Count V: Violations of substantive due process.**

Craig also claims a deprivation of substantive due process. "To succeed on [his] substantive due process claim, [Craig] must show that (1) [he had] a liberty or property interest; (2) the state deprived [him] of this liberty or property interest; and (3) the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 862 (4th Cir. 2001) (citations and quotation marks omitted). Because, as discussed above, Craig does not have a liberty or property interest that was implicated by the Defendants' conduct, the substantive due process claim will also be dismissed.

## V.    CONCLUSION

A genuine dispute exists about why Craig was terminated.  That dispute prevents entry of summary judgment on Craig's First Amendment claims (Counts One and Two).  However, despite that dispute, the Court will still enter summary judgment on Craig's various due process claims (Counts Three, Four, and Five) because Craig does not possess property or liberty interests that were implicated by his termination.  An appropriate order will issue.

Entered this _26th_ day of June, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE